**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

IN RE: CATALINA MARKETING                    Case No.  8:03-cv-1582-T-27TBM
CORP SECURITIES LITIGATION,

_____/

**REPORT AND RECOMMENDATION**

THIS MATTER is before the court on referral by the Honorable James D.

Whittemore for a Report and Recommendation on **Plaintiffs' Motion for Class Certification

and Incorporated Memorandum of Law** (Doc. 81).  By their motion, Lead Plaintiffs

Virginia Anderson and the Alaska Electrical Pension Fund seek an order appointing them as

class representatives and certifying this action as a class action on behalf of the class of all

persons who purchased the common stock of Defendant Catalina Marketing Corporation

between October 14, 1999, and August 25, 2003, and were damaged thereby, exclusive of

Defendant Catalina Marketing Corporation, Defendant Daniel Granger, and Defendant

Christopher Wolf, members of each Individual Defendant's family, any entity in which any

Defendant has a controlling interest, and the legal affiliates, representatives, heirs, controlling

persons, successors, and predecessors in interest or assigns of any such excluded party.

Defendants filed a response in opposition (Doc. 92), and Plaintiffs filed a reply memorandum

(Doc. 101).  Oral arguments were heard on November 30, 2005.

I.

By the allegations in the Consolidated Amended Class Action Complaint (Doc. 46) (hereinafter "Complaint"), Defendant Catalina Marketing Corporation (hereinafter "Catalina" or "the company") is a Delaware corporation with its principal offices in St. Petersburg, Florida.  Catalina provides targeted marketing services for consumer good companies, pharmaceutical manufacturers, and retailers.  At pertinent times, Catalina was organized by operating units, such as Catalina Health Resource (hereinafter "CHR"), which generates revenues by printing ads, coupons, and newsletters for pharmacies and pharmaceutical manufacturers.

Defendant Daniel Granger served as Chairman of the Board of Catalina and its Chief Executive Officer at relevant times until November 3, 2003.  Granger signed the fiscal year (hereinafter "FY") 2000, FY2001, and FY2002 Form 10-Ks and certified the second and third quarter Form 10-Qs for 2003.

Defendant Christopher Wolf is a Certified Public Accountant and has served as Chief Financial Officer of Catalina since June 14, 2002.  Prior to that, Wolf was a Vice President of Finance for Catalina and the company's Treasurer.  Wolf signed the 2000 and 2003 10-Ks and the 10-Q for the First Quarter of 2003.  Wolf also certified the restated financials for the second and third quarters of 2003.

Defendant Michael T. McClorey served as President of Health Services Marketing, an operating unit of Catalina, and as a member of the Office of the President since February 2000 and as Chief Executive Officer of Health Resource Publishing Company.

Defendant David Diamond has served as President of Catalina Marketing Emerging Businesses, an operating unit of the company and as a member of the Office of the President since February 2000 and as Chief Vision Officer since October 1998.

Defendant Michael G. Bechtol served as President of Catalina Marketing Service Worldwide from February 2000 to January 2002.  He served as President of Catalina Marketing Services-Manufacturer and International from January 2002 to April 15, 2003. From April 15, 2003, to September 12, 2003, Wolf served as Chief Operating Officer and President of Catalina.

Defendant Joseph P. Port, a Certified Public Accountant, served as Executive Vice President and Chief Financial Officer from July 2000 to June 14, 2002.  Port signed the Form 10-Ks for FY2000, FY2001, and FY2002 and the interim quarterly Form 10-Qs for those periods.

Plaintiffs are purchasers of Catalina stock between October 14, 1999, and August 25, 2003 (hereinafter "Class Period").[1]  By their Complaint, Plaintiffs allege violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against all Defendants (Count I) and violations of Section 20(a) of the Exchange Act against Granger, Wolf, McClorey, Diamond, Bechtol, and Port (Count II).[2]  Plaintiffs allege generally that during the

---

[1]Plaintiffs commenced this action on July 30, 2003.  See (Doc. 1).  On October 27, 2003, the court consolidated all related actions.  See (Doc. 21).  On December 4, 2003, the court appointed Virginia P. Anderson and the Alaska Electric Pension Fund (hereinafter "Alaska Fund") as Lead Plaintiffs.  See (Doc. 30).  On June 23, 2004, Plaintiffs filed the Consolidated Amended Class Action Complaint (Doc. 46).

[2]In Count II, the Plaintiffs allege that the individual Defendants had the power to influence and control and did influence and control the decision making of Catalina, including

Class Period, Defendants participated in a scheme to defraud or deceive purchasers of Catalina stock. More particularly, Plaintiffs allege that Defendants employed inappropriate accounting practices that inflated the company's value; made false and misleading public reports and press releases, particularly in relation to revenue and earnings potential; and failed to disclose adverse information about the company, thus causing the company's securities to be overvalued and artificially inflated. Plaintiffs maintain that insiders sold a total of 1,039,914 Catalina shares at artificially inflated prices and realized personal profits of $13,347,950,[3] while the purchasers of Catalina stock suffered damages when their stock value plummeted following a 2003 restatement.

As Plaintiffs describe the scheme, Catalina was, prior to summer 1999, an aggressive growth company that consistently increased its revenues by 30% or more from year to year. Analysts rated the company a "strong buy." However, by the summer of 1999, the checkout coupon business was showing signs of saturation and Catalina was facing declining sales. In order to maintain a strong financial picture, Defendants began to employ various accounting "machinations" to recognize revenue or boost earnings prematurely or inappropriately and ignored the Generally Accepted Accounting Principles (hereinafter "GAAP") to give the appearance of profits. At the same time, Defendants informed the market that "new profits" had been or would be generated by its European operations, its core segments, and its internet

---

the content and dissemination of misleading reports and statements to the investing public.

[3]According to Plaintiffs, during the class period, Granger sold 452,997 shares of Catalina stock for a net profit of $5,889,908; Bechtol sold 310,222 shares for a net profit of $4,771,660; Diamond sold 221,053 shares for a profit of $1,696,499; and McClorey sold 55,642 shares for a profit of $989,993. See (Doc. 46 at ¶ 225).

operation, Supermarkets Online, without due regard for the truth of the statements and repeatedly touted Catalina's strong financial condition despite knowing that revenues and earnings were declining.  Plaintiffs maintain that Defendants began disseminating these knowingly false and misleading statements to the public in FY2000[4] and that it was not until at least October 2002 when the fraud scheme began to unravel and the public began learning the truth about Catalina's financial condition.  As set forth in summary below, the truth of Catalina's deception was substantially revealed in 2003, and in March 2004, the Securities and Exchange Commission (hereinafter "SEC") issued a formal order of investigation regarding Catalina's accounting practices.  According to Plaintiffs, Defendants' accounting fraud and failure to inform investors of Catalina's true financial condition resulted in the stock price falling from a high of $44.00 in September 2000 to $14.56 in August 2003.

   The sequence of the public reports and statements upon which Plaintiffs rely in support of their claims and a summary of their substance is as follows.[5]

   On October 14, 1999, Defendants released Catalina's revenue and earnings results for the second quarter of FY2000, reporting that revenue grew at 31.5% and earnings increased by 23.5% when compared to the comparable period the prior fiscal year.  (Doc. 46 at ¶ 60).  The report further stated that Catalina's European operations increased its installed store base

_____

   [4]Catalina's fiscal year ran from April 1 to March 31 of the following year.  Thus, FY2000 ran from April 1, 1999, to March 31, 2000; FY2001 ran from April 1, 2000, to March 31, 2001; and so on.

   [5]Substantial excerpts from various public reports and press releases are included in the Complaint (Doc. 46).  By their Answer, Defendants admit the issuance of these reports and press releases and state that each release "speaks for itself."  See (Doc. 79).

5

to 2,004 and had year-over-year growth of approximately 27% during the quarter.  Id. at ¶ 63.

Commenting on the results, Defendant Granger stated:

> . . . We are extremely pleased with the overall performance of the company in the second quarter and the first half of our fiscal year.  The outstanding results are a reflection of the strength of our business in every operating area, particularly in the core domestic business.  The core domestic business continues to be a strong driver of our growth, with revenue increasing approximately 25 percent for the quarter over the comparable period last year. . . .
>
> With strong performance driven by the efforts of the entire management team, this quarter's outstanding results provide us with additional confidence that we will meet our business and financial expectations for the year. . . .

Id. at ¶¶ 60-63).  On November 12, 1999, Catalina filed with the SEC its Form 10-Q for the

quarterly period ended September 30, 1999, incorporating these financial results from October

14, 1999.  The form was signed by Defendant Port and purportedly reflected "all adjustments

. . . necessary to present fairly the financial position of the Company as of June 30, 2000. . . .

Depreciation and amortization increased to $8.6 million and $16.7 million for the second

quarter and first six months of fiscal 2000 from $6.6 million and $13.0 million for the

comparable periods in fiscal 1999."  Id. at ¶ 64.

In a press release dated December 2, 1999, Catalina announced its expectations for

increased earnings for the third quarter ending December 31, 1999, and for FY2000:

> The impact on the third quarter is anticipated to "improve earnings per share approximately $.03 to $.05 over current consensus expectations of $.80 per share."  The Company anticipates the third quarter improvement will not have a negative impact on current expectations for the fourth quarter of the fiscal year ended March 31, 2000.  The improvement

6

> stems from . . . "further development of the Company's
> European operations."

Id. at ¶ 65.  Defendant Port boasted that the company looked forward to "another record year

for fiscal 2000."  Id. at ¶ 66.

On January 13, 2000, Defendants again reported very strong revenue and earnings

growth for the quarter ended December 31, 1999.  Id. at ¶ 67.  Additionally, Defendants

reported that the European operations experienced strong revenue growth with year-over-year

growth during the quarter of approximately 58%.  Id. at 69.  Defendant Granger commented:

> Our performance was outstanding during the quarter.  Our
> record results for revenue and earnings were driven by the
> strength of our core domestic business, which experienced
> quarterly revenue growth of 32 percent over last year.  I am
> also extremely pleased with the financial performance of our
> European operations.

Id. at ¶ 68.

On February 14, 2000, Catalina filed with the SEC its Form 10-Q for the quarterly

period ended December 31, 1999, which incorporated the financial results announced on

January 13, 2000.  The report also reported the purchase of a vendor, CompuScan, and an

increased depreciation due to additional investment in capital expenditures and increased

amortization expense due to additions in goodwill.  The Form 10-Q was signed by Defendant

Port.  Id. at ¶ 70.

On June 16, 2000, Catalina filed its Form 10-K, signed by Defendants Port and

Granger, for the year ended March 31, 2000.  By Plaintiffs' allegations, Catalina therein

overstated net income and earnings substantially.  Id. at ¶¶ 71, 76.  Plaintiffs maintain that the

7

reporting and other statements touting the success of Catalina's European operations and its

strong financial results for FY2000 were false and misleading, as the company had actually lost

its single biggest client in the United Kingdom (hereinafter "UK") in 1999, yet failed to

disclose this fact until June 2000.  Id. at  ¶¶ 73-75.   Because Defendants failed to conduct an

impairment analysis and properly and timely account for the resultant loss of goodwill, the true

financial impact of the contract loss was masked from the public.  This failure to take the

impairment charge in a timely fashion resulted in an overstatement of net income for FY2000

by 56%.  Id. at  ¶ 75.  Plaintiffs argue that the misstatements were made by Defendants

knowingly and continued into FY2001 as follows.

On July 17, 2000, Defendant issued a press release announcing financial results for

the quarter ended June 30, 2000, claiming that revenue grew 29% and earnings grew 30%

when compared to the comparable prior year period.  Id. at ¶ 77.  Defendant Granger stated in

this press release:

> This was a tremendous start to the new fiscal year, with
> outstanding quarterly growth in earnings, revenue and cash
> flows accompanied by superb rates of return.  The
> performance was led by the core domestic business, with
> revenue and earnings growth of over 20 percent compared to
> the first quarter of the prior year.

Id. at ¶ 78.

On August 14, 2000, Defendants filed Catalina's quarterly report on Form 10-Q,

which incorporated results previously announced on July 17, 2000, and was signed by

Defendant Port.  Id. at ¶ 79.

On October 16, 2000, Defendants issued a press release reporting second quarter results for the quarter ended September 30, 2000, claiming a 17% growth in revenue and a 22% growth in earnings over the comparable prior year period.  Id. at ¶ 80.  Commenting on these financial results, Defendant Granger stated, "We achieved a significant milestone by generating over 100 million dollars in revenue during the quarter."  Id. at ¶ 81.

On November 13, 2000, Catalina filed a Form 10-Q signed by Defendant Port and incorporating these results from the October 16, 2000, press release.  Id. at ¶ 83.

On January 11, 2001, Catalina issued a press release reporting third quarter results, claiming revenue growth of 11% and earnings growth of 7% over the comparable prior year period.  Id. at ¶ 84.  The press release also touted revenue growth in the Health Resource operation of 60%.  Id. at ¶ 85.  Commenting on these results, Defendant Granger stated, "Our Health Resource operation turned in another strong performance, achieving its second consecutive quarter of positive EBITDA,[6] and making Health Resource EBITDA positive on a year-to-date basis."  Id. at ¶ 85.  These results were incorporated into Catalina's quarterly report on Form 10-Q filed on February 13, 2001, and signed by Defendant Port.  Id. at ¶ 86.

On April 19, 2001, Defendants issued a press release reporting revenue growth of 21% for the fourth quarter of 2001.[7]  Id. at ¶ 87.  As to the results of this quarter and fiscal year ending March 31, 2001, Granger stated:

---

[6]Earnings before interest, taxes, depreciation, and amortization.

[7]Paragraph 87 of the Complaint alleges that the April 19, 2001, press release reported the financial results for the "fourth quarter of 2000," but this appears to be a scrivener's error.

> I am pleased that the performance of our management team enabled us to reach the top of our range for earnings expectations in the fourth quarter.  In the face of challenges we outlined at the end of our last quarter, we made appropriate operational changes to ensure we would meet our revised earnings estimates.  As a result, the core domestic business achieved outstanding revenue growth, increasing approximately 28 percent over last year.  Heath Resource Publishing achieved a major milestone, reaching quarterly profitability for the first time in its history. . . . Based upon our financial results in fiscal year 2001, our estimate for fiscal year 2002 is that both revenue and earnings will grow between 20 and 25 percent on an annual basis, which is consistent with our previous guidance.  For the first quarter, we expect consolidated revenue to grow approximately 10 percent over the prior year first quarter.  In addition, we estimate consolidated first quarter earnings per share to be equal to or modestly higher than earnings per share of the first quarter of fiscal year 2001.  Although the growth rates in the first quarter are less than the annual targets, based on client commitment levels and our analysis of recent selling activity, we believe that we will achieve our objectives for the total year. . . .

Id. at ¶¶ 88-89.

On June 22, 2001, Defendants filed Catalina's Annual Report on Form 10-K for year ended March 31, 2001, signed by Defendants Granger and Port.  In a "results of operations section," the 10-K stated:

> Year Ended March 31, 2001 compared to Year Ended March 31, 2000
>
> Revenues were $417.9 million in fiscal 2001, up 19 percent over revenues of $350.9 million in fiscal 2000.  The increase in revenues is due to an increase in promotions printed worldwide, expansion of the Health Resource Network, growth in Checkout Direct(R) programs as well as increases in direct mail marketing and other loyalty programs.

Id. at ¶ 90.

10

The company distributed its Annual Report to Shareholders for fiscal year ended

March 31, 2001, including "Fiscal Year 2001 Highlights":

> Aggressive Growth Goals
>
> We expect that the Catalina Marketing name will eventually become synonymous with targeted marketing to consumers wherever and whenever they make purchase decisions. We also expect to continue the momentum we developed last year in expanding our overall sales portfolio delivered from our in-store network printers through new direct mail target solution, expanded Internet product services, enhanced loyalty marketing services products, growth in our attitudinal research and continued expansion of Checkout Direct. We remain committed to financial performance targets of increasing revenue and earnings 20 to 30 percent annually and achieving a return on equity of 30 percent. . . .
>
> Heath Resource, our division that delivers targeted health-related communication to consumers at the pharmacy, will continue to leverage the tremendous success achieved this year. While we will focus on our basis newsletter product, we see a continued opportunity to expand our portfolio of services for the business. This past year, we added several new products to our portfolio including Compliance Direct, Generic Compliance Plus, and a pharmacist information program called PharmAware. And, we continue to look for new opportunities within this business. We believe that the combined reach and breadth of services we provide will enable Health Resource to grow and achieve our goal of full-year profitability in the new fiscal year.

Id. at ¶¶ 91-92.

Plaintiffs argue these statements by Defendants for FY2001 were false and misleading

as revealed by the 2003 restated 10-K. Thus, the company had overstated net income for

FY2001 by 23% and failed to properly accelerate depreciation and amortization expenses

associated with its UK operations and the loss of contract and failed to take a goodwill

impairment charge associated with the acquisition of CompuScan. According to Plaintiffs,

11

Defendants knew Catalina's sales were declining, and they lacked any reasonable basis for their stated growth projections.  Plaintiffs maintain that the misrepresentations continued into FY2002.

On June 20, 2001, Defendants issued a press release updated Catalina's quarterly revenue and earnings outlook for the first quarter ending June 30, 2001, and the fiscal year ending March 31, 2002.  Id. at ¶ 98.  Defendant Granger commented:

> The updated revenues and earnings outlook for the first quarter relates primarily to reduced spending by our manufacturer clients in our core domestic business.  We expect this manufacturer spending trend to continue through the second quarter.  Looking ahead to the third and fourth quarters, based on client commitments and our analysis of recent selling activity, we expect manufacturer revenue on in the core domestic business will enable us to meet our revised quarterly targets.  Although we have revised estimates in the manufacturer sales component of our core domestic business, I remain confident that our other business units will continue to meet previously stated expectations.

Id.

On July 18, 2001, Defendants issued a press release reporting first quarter results for the period ended June 30, 2001, and reflecting only a slight increase over the comparable prior year period.  By this report, Defendants announced the implementation of Statement of Financial Accounting Standard No. 142, relating to the amortization of goodwill, as well as increased in the company's net income and earnings.  Id. at ¶ 100.  Additionally, this report announced the second consecutive profitable quarter of Health Resource Publishing and an increase in revenue of approximately 98%.  Id.  As to these results, Defendant Granger stated:

Our results were right in line with our previously announced expectations. As we outlined in our June 21 press release, we have experienced a near-term reduction in client spending in our core domestic business, which had an adverse affect on revenue for the quarter. Our consolidated results for the quarter reflect the decrease in revenue in the core domestic business. In the face of this challenge, our management team made the appropriate operational changes to ensure that we met our earnings estimates for the quarter. I am pleased with the accomplishments in several of our business units this quarter. Health Resource posted its second consecutive quarter of profitability and increased its revenue in the quarter by 98 percent.

As we have previously discussed, the reduction in tactical spending by our clients in the core domestic business is expected to continue into the second quarter. Based upon our financial results in the first quarter, client commitments and recent selling activity, we estimate that consolidated revenue will increase between 3 and 7 percent compared to the second quarter of last fiscal year. While our previous guidance from the June 21 press release has not changed, we have updated our earnings estimates to reflect the new accounting pronouncement. Reflecting the change, we estimate that consolidated second quarter earnings will equal between 20 and 22 cents per share.

We have also updated our earnings estimates for the second half of the year to reflect the new accounting pronouncement. In the third quarter, on a consolidated basis, we expect to grow revenue between 20 and 22 percent and project earnings to be between 35 and 38 cents per share. This will result in total year consolidated revenue growth between 10 and 20 percent and consolidated earnings per share in the range of $1.19 to $1.27.

Id. at ¶¶ 101-02. These financial reports were repeated in Catalina's quarterly report on Form

10-Q filed on August 14, 2001, and signed by Defendant Port. Id. at ¶ 104.

13

On October 18, 2001, Defendants issued a press release announcing a slight revenue increase for the second quarter, ended September 30, 2001, over the comparable prior year period. Id. at ¶ 105. On these financial results, Defendant Granger commented that

> The results for the second quarter were stronger than we had anticipated. Despite a challenging business environment, our management team remained focused and delivered solid results. Several of our operating units posted strong performances that were instrumental in driving our results for the quarter. Health Resource once again achieved solid revenue growth by more than doubling its revenues over the prior year second quarter. Our search operations produced impressive quarterly year-over-year growth rates of approximately 27 percent in revenue and approximately 85 percent in earnings. . . . In light of the current economic environment, we have revised our revenue and earnings projections for the remainder of the fiscal year. For the third quarter, on a consolidated basis, we expect to grow revenue between 4 and 7 percent over the prior year and project earnings to be between 30 and 33 cents per share. For the fourth quarter, we are projecting consolidated revenue to grow between 20 and 25 percent over the prior year and consolidated earnings to equal between 38 and 42 cents per share. This will result in total year consolidated revenue growth between 7 and 9 percent and consolidated earnings per share in the range of $1.06 to $1.13.

Id. at ¶ 107. These results were incorporated in the Form 10-Q filed on November 14, 2001, and signed by Defendant Port. Id. at ¶ 108.

On January 17, 2002, Defendants issued a press release announcing third quarter results for the period ended December 31, 2001. With respect to CHR, Granger stated:

> Our performance for the quarter was highlighted by Health Resource, which produced another quarter of outstanding results. For the quarter, revenue increased by more than 100 percent over the third quarter of the prior fiscal year, and it recorded its fourth consecutive quarter of profitability.

14

> Health Resource added over 3,000 stores to its network this quarter, giving it a total of more than 17,600 pharmacy outlets at quarter end.  These are truly exceptional achievements.

> Health Resource will continue to build upon the strong foundation of profitability in this fiscal year.  Based upon our projected financial performance for fiscal 2002, and the expected strength of both the core domestic business and Health Resource, our preliminary estimate for fiscal year 2003 is that both revenue and earnings will grow between 20 and 25 percent on an annual basis.  These revenue and earnings growth rates are consistent with our historical growth rates.

Id. at ¶ 109.  These statements were incorporated into a quarterly report for the third quarter on a Form 10-Q filed on February 14, 2002, and signed by Defendant Port.  Id. at ¶ 110.

On April 18, 2002, Defendants issued a press release reporting a revenue increase of 18% for the fourth quarter and 7% for the fiscal year ended March 31, 2002.  Id. at ¶ 111. Commenting on the quarter and the upcoming fiscal year, Defendant Granger stated:

> As we have previously stated, our expectation is for annual consolidated revenue and earnings growth of between 20 and 25 percent of our fiscal 2003 year.  For the first quarter, we expect consolidated revenue and earnings to grow between 10 and 15 percent over the prior year first quarter.  Although the growth rates in the first quarter are less than the annual targets, the first quarter targeted growth rates are consistent with our previous expectation and we remain committed to our consolidated revenue and earnings growth rate of objectives for the fiscal year.

> The fourth quarter provided a strong finish to our fiscal year.  Our results were driven by the performance of the core domestic business, which posted quarterly revenue growth of approximately 18 percent.  This is a remarkable achievement in the current uncertain economic environment and when compared to the prior year fourth quarter, which had

15

experienced quarterly revenue growth of approximately 28 percent over the comparable fiscal 2000 quarter. Health Resource was another catalyst, achieving quarterly revenue growth of approximately 91 percent and posting its fifth consecutive quarter and first full year of profitability.

Id. at ¶ 112-13.

On May 23, 2002, Defendants filed an Annual Report on Form 10-K for the fiscal year ended March 31, 2002, repeating these financial results. Id. at ¶ 114. The company's annual report to shareholders reported similar strong financial results and for FY2003 and affirmed the commitment to increase revenue and earnings by 20-30% annually. Id. at ¶117. The report was signed by Defendants Port and Granger. Id. at ¶ 114.

Plaintiffs maintain that Defendant knowingly overstated the net income for FY2002 by 6%, and as Catalina later admitted, the company had engaged in improper revenue recognition across many business segments by reason of deficiencies in its internal financial controls. According to Plaintiffs, the misrepresentations continued into FY2003, but the fraud began to unravel.

In May 2002, Earnst & Young, LLP (hereinafter "E&Y") replaced Arthur Anderson LLP as Catalina's auditor, after Anderson was barred from auditing public companies after its conviction for obstruction of justice in the Enron case.

Defendant Port resigned as Chief Financial Officer on June 14, 2002. Id. at ¶ 163.

On July 18, 2002, Defendants issued a press release concerning the first quarter of 2003, the period ended June 30, 2002, reporting revenue growth of 16%. Id. at ¶ 120. On

16

these results, the second quarter and 2003 prospects, and the Health Resource division,

Defendant Granger commented:

> I am pleased with our performance this quarter.  Our results were at the higher end of the range of our previously announced expectations.  The core domestic business had another strong quarter with revenue growth of nineteen percent over the first quarter of last year.  The financial results of the core domestic business were achieved primarily as the result of outstanding revenue growth in our retail and direct mail operations. . . .
>
> Based upon our financial results in the first quarter, client commitments and recent selling activity, we estimate that consolidated revenue will increase between 15 and 20 percent compared to the second quarter of last fiscal year.  As a result of our expected revenue growth, we estimate that consolidated second quarter earnings will fall between 25 and 26 cents per share. . . .
>
> As we have stated previously, we expect to grow consolidated revenue and earnings per share between 20 and 25 percent on an annual basis in fiscal year 2003.  After review of our first quarter results and our current estimates for the remainder of the fiscal year, we still expect to achieve those targets. . . .
>
> Health Resource posted another solid quarter, with revenue growth of 28 percent over the first quarter of fiscal 2002.  During the quarter, Health Resource signed the largest contract in its history, a multi-year agreement with a major pharmaceutical manufacturer, further indicating that our clients believe in the value of the patients' right to be informed of their health care choices via the one-to-one communication of the Health Resource Network.

Id. at ¶ 120-23.

On the same day, Defendants held a conference call for analysts and investors to

discuss first quarter 2003 results.  Id. at ¶ 124.  In that call, Defendant Granger stated:

17

> First, for those of you who have not seen the press release yet, let me start with an overview of our first quarter performance. . . .
>
> These results were at the high end of the guidance, with revenue growth slightly exceeding the expectation that we had provided at the end of last quarter.  Once again, I need to thank everyone in the Catalina organization for remaining focused and delivering on our unexpected results.  It is a true restatement to our people that in this uncertain, economic environment, Catalina has continued to deliver strong, financial results, led by double-digit growth rates in the quarter.
>
> Taking a look at the individual operating units' quarterly performance, revenue in the core, domestic business was up a very strong 19 percent, compared to the first quarter of last year.  As we stated in the press release, one of the highlights of these results was in the CMS retail sales area, with a strong double-digit increase year-over-year.

Id.  As to the outlook for the second quarter of 2003, Granger stated:

> Now let's turn to the second quarter of fiscal 2002.  As we have stated earlier, our fiscal-year 2002 goal is to -- just to grow consolidated revenue and earnings between 20 and 25 percent on an annual basis.  Based on our recent performance and our latest estimates, we still expect to accomplish these goals.
>
> Heading into the second quarter, we anticipate consolidated, quarterly revenue and earnings growth of 15 to 20 percent.  These amounts are consistent with our earlier, internal estimates and put us on target to achieve our annual growth objectives. . . .
>
> The quarter was a solid start for the fiscal year for the entire team, and I'm very proud of the team -- that we've achieved some extraordinary results.  What we communicated in the last conference session is what we did, and we delivered.

18

> This management team is . . . second to none in the
> marketing services industry.  The strength in the two key
> areas of our business -- the core domestic business, as well as
> Health Resource -- really do provide confidence, in the
> expectations and the numbers that we've communicated, for
> achieving the previously-stated goal of 20 to 25 percent
> revenue and earnings growth, year over year, in the fiscal
> year 2003.

Id. at ¶¶ 125, 127.  In this same conference call, Chris Wolf added:  "In the second quarter,

Health Resource is expected to increase revenue by 25 to 30 percent and grow revenue

between 35-45 percent for the full year."  Id. at ¶ 126.

On August 14, 2002, Defendants filed a quarterly report on Form 10-Q with the SEC

that repeated these first quarter financial results, stating:

> In the opinion of the Company, the accompanying unaudited
> condensed consolidated financial statements reflect all
> adjustments (consisting only of normal recurring adjustments)
> necessary to present fairly the financial position of the
> Company as of June 30, 2002 and March 31, 2002, and the
> results of operations and cash flows for the three month
> periods ended June 30, 2002 and 2001.

Id. at ¶ 128.  The Form 10-Q was signed by Defendant Wolf.  Id.

According to Plaintiffs, these statements regarding first quarter 2003 performance

were false and misleading as the Defendants well knew.  On October 1, 2002, Catalina issued a

press release revising downward both its quarterly and annual expectations for revenue and

earnings from the press release and conference call on July 18, 2002.  Id. at ¶ 130.

Specifically, Catalina gave a revised report that its revenues increased only by 6% to 8% for

the quarter ended September 30, 2002, and it revised estimates for revenue growth for fiscal

year ending March 31, 2003, to between 10% and 13%; revenue growth of 8% to 12% for the

19

quarter ending December 31, 2003; and revenue growth of 10% to 15%.  Id. at ¶ 130.

Commenting on these revisions, Defendant Granger stated:

> Our revised revenue and earnings estimates for the second quarter and the fiscal year reflect primarily the current market conditions affecting Health Resource.  We have experienced a decrease in the amount of promotional spending by our pharmaceutical clients, and retail pharmacies have become more selective in their program participation.  While we expect this situation to improve, our current outlook is for reduced promotional activity to continue for the remainder of the current fiscal year.  While these near term reductions to expectations are disappointing, we remain confident in the prospects of Health Resource.

Id. at ¶ 131.

On this news, Catalina stock dropped from $27.97 to $17.90, resulting in a 36%

reduction in Catalina's market capitalization, and CIBC World Markets downgraded Catalina

from a Sector Outperformer to Sector Underperformer.  Id. at ¶¶ 132, 133.

On October 18, 2002, Defendants issued a press release reporting second quarter

2002 revenue growth of 9% and revenue growth of 12% for the six-month period ended

September 30, 2002.  Id. at ¶ 134.  On these results, Defendant Granger commented:

> Our results for the quarter were in line with the guidance provided in our October 1, 2002 press release.  As we described in the earlier release, revenue and earnings were impacted by current market conditions affecting Health Resource.  We have experienced a decrease in the amount of promotional spending by our pharmaceutical clients, and retail pharmacies have become more selective in their program participation.  While these near term reductions to expectations are disappointing, we remain confident in the long term prospects of Health Resource.

Id. at ¶ 135.  On November 13, 2002, Defendants filed a quarterly report on Form 10-Q for the quarter ended September 30, 2002, and signed by Defendant Wolf.  Id. at ¶ 136. Defendants Granger and Wolf signed Sarbanes Oxley 906 Certifications affirming the veracity of the information included in the second quarter's Form 10-Q.  Id.

On January 16, 2003, Defendant issued a press release reporting revenue growth of 4% for third quarter 2002 and 9% for the nine-month period ended December 31, 2002.  Id. at ¶ 137.  The released further reported that revenue for Health Recourse had fallen by 14%.  Id. at ¶ 138.

On February 12, 2003, Defendants filed a quarterly report on Form 10-Q with the SEC, reporting these results for the period ending December 31, 2003.  Id. at ¶ 139. Defendant Wolf signed the Form 10-Q, and Defendants Wolf and Granger certified the statements pursuant to section 906 of Sarbanes Oxley.

On April 15, 2003, prior to the market opening, Defendants issued a press release disclosing the extent of the company's revenue and earnings miss related to the belated charge against goodwill in Catalina Marketing UK.  This press release include Granger's comments about the company's fourth quarter earnings:

> The fourth quarter results were disappointing.  While most of our business units performed fairly well and in accordance with our previous guidance, Catalina Health Resource, our targeted newsletter solution for pharmacies, experienced a disappointing fourth quarter with a significant shortfall in revenue.  The business continues to be negatively impacted by a challenging environment in which our pharmaceutical clients and retail pharmacies remain cautious in their program participation.  Additionally, our Catalina Marketing UK business model no longer supports its asset carrying value

> and, accordingly, it was appropriate to recognize an expense
> for the impairment of assets. While we are disappointed in
> our results in the current quarter, we remain focused and
> committed to executing our long-term strategic behavior-
> based targeted marketing initiatives.

Id. at ¶ 140. That day, Catalina's stock price declined to $15.51 per share. Id. at ¶ 142. By Plaintiffs' contentions, Defendants knew in FY2000 that its UK operations were impaired, yet they failed to record or report the impairment in a timely fashion, resulting in significantly inflated revenue and earnings reports.

On the same day, Defendant Diamond, President of Emerging Business and Chief Vision Officer, tendered his resignation. Id. at ¶ 164.

On May 1, 2003, the company issued a press release announcing the resignation of George Neal, President and Chief Operating Officer of CHR. Id. at ¶ 143.

On June 30, 2003, after the close of trading, Defendants revealed that Catalina would delay the filing of its Form 10-K Annual Report because of "revenue recognition issues" at CHR. The press release revealed that Catalina would be forced to restate financial results for FY2003. Id. at ¶ 144.

On July 15, 2003, Defendants announced that the accounting issues were not limited to CHR, but instead, Catalina was "reviewing certain other revenue recognition timing matters in its core domestic business." Id. at ¶ 146.

On August 13, 2003, the company issued a press release announcing the resignation of Defendant Bechtol. Id. at ¶ 147.

Two days later, the company issued a press release announcing a delay in the filing of its Form 10-Q quarterly report for first quarter of FY2004, ended June 30, 2003. Id. at ¶ 148. The delay was attributed to the company's review of revenue recognition timing matters within CHR. It advised, "[p]reviously filed financial statements, . . . of the company should not be relied upon until the company files its annual report. . . ."

On August 20, 2003, E&Y resigned without issuing an auditing opinion on Catalina's FY2003 financial statements. Id. at ¶ 150. The day before E&Y's resignation was announced, Catalina's stock traded at $15.15 per share. The day after the announcement, August 26, 2003, the price fell to $12.01. Id. at ¶ 152.

According to the company's Form 8-K, E&Y had raised questions with respect to several matters, specifically CHR's revenues and the accounting for customer contracts with exclusivity provisions (hereinafter "the Exclusivity Issue"), and whether the accounting for such matters conformed with GAAP. Id. at ¶¶ 154-55. While Catalina reported that there were no disagreements with E&Y concerning accounting principles or practices, financial statement disclosure, or auditing scope or procedure, E&Y insisted that the Exclusivity Issue did constitute a disagreement and a reportable event under Item 304(a)(1)(v) of Rule S-K. Id. at ¶¶ 156-60.

On October 2, 2003, Catalina retained PricewaterhouseCoopers LLP (hereinafter "PwC") as its outside auditor. PwC was tasked to re-audit Catalina's results for FY2001 and FY2002 and to audit FY2003. Id. at ¶ 161.

On March 5, 2004, the SEC issued a formal order of investigation regarding Catalina's accounting practices. Id. at ¶¶ 17. This was revealed by the company on March 9, 2004. Id. at ¶ 162.

On May 1, 2003, CHR President George Neal resigned. Id. at ¶ 164.

On November 3, 2003, Defendant Granger resigned as CEO and Chairman of the Board. Id. at ¶ 165. Later that month, the company announced the resignation of Group President Patricia Melanson. Id.

On March 18, 2004, Catalina Director Philip B. Livingston, a member of the Audit Committee, resigned. Id. at ¶ 166.

On May 17, 2004, the company filed its Form 10-K for the year ended March 31, 2003, disclosing its accounting restatements for the FY2000, FY2001 and FY2002. Id. at ¶ 169. Among other things, the report revealed that the company's net income for FY2000 was reduced by $18.2 million, mostly associated with the company's failure to properly report the impaired goodwill associated with its UK operations. The restatement indicated that net income for FY2001 was overstated by 19%, and the net income for FY2002 was overstated by 5%. Plaintiffs allege a variety of other accounting irregularities in connection with efforts to artificially boost its revenues and earnings including that the company failed to defer revenue in certain cases, understated cost and expenses, improperly accrued liabilities, and failed to write-down impaired assets, including goodwill, in a timely and proper manner.

Additionally, Plaintiffs maintain that Catalina, consistently throughout the Class Period, failed to discuss known trends and uncertainties that it knew would have a material

unfavorable impact on net sales or revenues or income, nor did it discuss material events or uncertainties it knew would cause reported financial information not to be indicative of future operating results or financial condition, in violation of Item 303(a)(ii) to Regulation S-K. Further, Plaintiffs allege that Defendants essentially were cooking Catalina's books with improper accounting devices in order to inflate the price of its stock. Thus, Plaintiffs allege a variety of such accounting irregularities in connection with efforts to boost its revenues and earnings artificially, including allegations that the company failed to defer revenue even when there was no evidence of sales and services had not been provided; understated direct cost and operating expenses, improperly accrued liabilities and prepayments; failed to write-down impaired assets, including goodwill, in a timely and proper manner; and improperly accounted for costs incurred in connection with software development. Id. at ¶ 176.

II.

A.

Plaintiffs filed the instant motion seeking the certification of a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs argue that common questions of law and fact predominate as to all members of the class and that a class action is superior to alternative methods for the fair and efficient adjudication of this action. Defendants filed a response in opposition (Doc. 92) arguing that the lead Plaintiffs are not adequate class representatives because they lack standing to assert at least two of the four distinct claims in this suit and that their claims are not typical of the class they seek to represent other than those

class members who were injured by the so-called 2003 Projection claim.  Further, by

Defendants' account, the Lead Plaintiffs are uniquely susceptible to a "truth on the market"

defense because they purchased Catalina stock after the market had already been informed that

the company would not meet those projections.[8]

## B.

The district court has broad discretion in determining whether to certify a class.

Heaven v. Trust Co. Bank, 118 F.3d 735, 737 (11th Cir. 1997); Forehand v. Fla. State Hosp.

at Chattahoochee, 89 F.3d 1562, 1566 (11th Cir. 1996); Washington v. Brown & Williamson

Tobacco Corp., 959 F.2d 1566, 1569 (11th Cir. 1992).  As a threshold matter, the court must

ascertain whether the individual named plaintiffs have constitutional standing to raise their

claims.  Murray v. Auslander, 244 F.3d at 807, 810 (11th Cir. 2001); Carter v. West Publ'g

Co., 225 F.3d 1258, 1262-63 (11th Cir. 2000); Prado-Steiman ex rel. Prado v. Bush, 221 F.3d

---

[8]The court granted Plaintiffs leave to file a reply (Doc. 101).  Plaintiffs counter that they are adequate and typical class representatives who are well-suited to represent the class because their claims and the claims of other members of the proposed class all arise from Defendants' fraudulent scheme and that the losses suffered by each were suffered in the same fashion -- by purchasing Catalina stock at artificially inflated prices and then suffering damages as the truth about Catalina was revealed and the stock price tumbled.  Plaintiffs argue that Defendants inappropriately parse their claims into four distinct claims.  Citing In re Catalina Mktg. Corp. Sec. Litig., 225 F.R.D. 684, 687 (M.D. Fla. 2003), lead Plaintiffs argue that Defendants' loss causation argument has already been considered and rejected by this court and, in any event, does not render them inadequate or their claims atypical.  Indeed, they maintain that loss causation is not an issue related to class certification at all.  They also assert that the timing of their purchases does not render them atypical where, as here, the claims of the all members of the class arise from the same pattern or practice and are based on the same legal theory.  Finally, they urge that their claims are not subject to any *unique* defenses, as the "truth on the market" defense may be asserted against all class members who purchased Catalina stock during the same period as Plaintiffs, and in any event, the defense is inappropriate to assert at this stage of the proceedings.

1266 (11th Cir. 2000).  It is not enough that a named plaintiff can establish a case or controversy between himself and the defendant.  "Rather, each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim."  Griffin v. Dugger, 823 F.2d 1476, 1483 (11th Cir. 1987).  "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members."  Gen. Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 156 (1982) (quoting East Texas Motor Freight Sys., Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)).

Rule 23(a) of the Federal Rules of Civil Procedure provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Id.  These requirements are commonly referred to as (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997); Falcon, 457 U.S. at 156; Jones v. Firestone Tire & Rubber Co., 977 F.2d 527, 534 (11th Cir. 1992).  The burden of proving these prerequisites is on the representative parties seeking class certification.  Rutstein v. Avis Rent-a-Car Sys., Inc., 211 F.3d 1228, 1233 (11th Cir. 2000); Heaven, 118 F.3d at 737.  It is well-established that class actions are a particularly appropriate means for resolving securities fraud actions.  See Cheney v.

Cyberguard Corp., 213 F.R.D. 484, 489 (S.D. Fla. 2003) (quoting In re Amerifirst Sec. Litig., 139 F.R.D. 423, 427 (S.D. Fla. 1991)).

Rule 23(a)(1) provides that a class action may be maintained only if the class is so numerous that joinder of all class members is impracticable.  There is no yardstick that measures the minimum class members necessary to satisfy the requirements of numerosity.  Armstead v. Pingree, 629 F. Supp. 273, 279 (M.D. Fla. 1986) (citing Jones v. Diamond, 519 F.2d 1090, 1099 (5th Cir. 1975)).  Numerosity depends on the circumstances of each case.  Factors to be considered by the court include the proposed class size, ease of identifying members' names and addresses, ease with which they could be served, and their geographic location.  Kilgo v. Bowman Transp., Inc., 789 F.2d 859, 878 (11th Cir. 1986); Garcia v. Gloor, 618 F.2d 264, 267 (5th Cir. 1980).  It is not necessary that a precise number of class members be known; Plaintiffs may make reasonable and supported estimates as to the size of the proposed class.  Fuller v. Becker & Poliakoff, P.A., 197 F.R.D. 697, 699 (M.D. Fla. 2000).

Next, the Plaintiffs must meet the commonality requirement by identifying specifically questions of law and fact common to the named Plaintiffs and putative class members.  Class relief is appropriate when the "issues involved are common to the class as a whole" and when they "turn on questions of law applicable in the same manner to each member of the class."  Falcon, 457 U.S. at 155 (quoting Califano v. Yamasaki, 442 U.S. 682, 701 (1979)).  Although the court should not, at the class certification stage, determine whether the plaintiff has stated a cause of action or will prevail on the merits, "evidence relevant to the commonality

28

requirement is often intertwined with the merits." Hudson, 90 F.3d at 457 (quoting Nelson v. U.S. Steel Corp., 709 F.2d 675, 679 (11th Cir. 1983)).

The third element of Rule 23(a) requires the Plaintiffs to establish that their claims are typical of the claims of the class members as a whole.  Without individual standing to raise a claim, a named representative also does not have the requisite typicality to raise the same claim on behalf of the class. Franze v. Equitable Assurance, 296 F.3d 1250, 1254 (11th Cir. 2002) (quoting Piazza v. Ebsco Indust., Inc., 273 F.3d 1341, 1346 (11th Cir. 2001)).  Plaintiffs may satisfy the typicality requirement upon showing that there is a "strong similarity of legal theories," despite substantial factual variations.  Murray, 244 F.3d at 811 (quoting Appleyard v. Wallace, 754 F.2d 955, 958 (11th Cir. 1985)); see also Kornberg v. Carnival Cruise Lines, Inc., 741 F.2d 1332, 1337 (11th Cir. 1984) (typicality may be demonstrated where Plaintiffs' claims "arise from the same event or pattern or practice and are based on the same legal theory" as the claims of the class).  "Traditionally, commonality refers to the group characteristics of the class as a whole and typicality refers to the individual characteristics of the named plaintiff in relation to the class." Prado-Steiman, 221 F.3d at 1279.  Although commonality and typicality constitute two distinct limitations on class certification under Rule 23, they tend to merge in practice.  Falcon, 457 U.S. at 157 n.13.

Finally, named Plaintiffs must establish the adequacy of themselves and of counsel to represent the putative class.  "The adequate representation requirement involves questions of whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation, and of whether plaintiffs have interests antagonistic to the rest of the

29

class."  Griffin v. Carlin, 755 F.2d 1516, 1532-33 (11th Cir. 1985), quoted in Shores v. Sklar,

844 F.2d 1485, 1495 (11th Cir. 1988); Johnson v. Ga. Highway Express, Inc., 417 F.2d 1122,

1125 (5th Cir. 1969).  This analysis encompasses two separate inquiries:  (1) whether any

substantial conflicts of interest exist between the representatives and the class; and (2) whether

the representatives will adequately prosecute the action.  Valley Drug Co. v. Geneva

Pharmaceuticals, Inc., 350 F.3d 1181, 1189 (11th Cir.  2003) (quoting In re HealthSouth

Corp. Sec. Litig., 213 F.R.D. 447, 460-461 (N.D. Ala. 2003)).  Class certification is

inappropriate if substantial conflicts of interest are determined to exist among the class.  Valley

Drug, 350 F.3d at 1189.   "A class representative must be part of the class and 'possess the

same interest and suffer the same injury' as the class members."  Amchem, 521 U.S. at 625-26

(citing Falcon, 457 U.S. at 157-58 n.13, and quoting East Tex. Motor Freight, 431 U.S. at

403).

        If the Plaintiffs establish each of these four factors, they must then satisfy at least one

of the alternative requirements of Rule 23(b).  Amchem Prods., 521 U.S. at 614; Griffin, 823

F.2d at 1482; Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1005 (11th Cir. 1997).


                                        III.

                                        A.

        Regarding Defendants' claim that lead Plaintiffs lack standing or are subject to unique

defenses on three of the four claims made in this suit, Defendants characterize Plaintiffs' claims

                                        30

as involving four distinct sets of misrepresentations about different events in different fiscal

years:

1.   <u>UK Impairment Claim</u>.  Plaintiffs claim that the financial results for
     fiscal year 2000 failed to disclose the impairment of intangible assets
     at Catalina UK

2.   <u>Revenue Recognition Claim</u>.  Plaintiffs claim the company's quarterly
     and annual financial results for fiscal years 2001 and 2002 were
     misleading based on the restatements of revenue at CHR.

3.   <u>2002 Projections Claim</u>.  Plaintiffs claim that Defendants
     misrepresented its revenue and growth projections for fiscal 2002.

4.   <u>2003 Projections Claim</u>.  Plaintiffs claim that Defendants
     misrepresented its revenue and growth projections for fiscal 2003.

<u>See</u> (Doc. 92-1 at 3-4).  Defendants further argue that the "truth" about these alleged

misrepresentations was revealed in the following corrective disclosures:

1.   The October 1, 2002, press release revised downward the 2003
     projections that the company had made earlier in January, April, and
     July 2002.

2.   The April 15, 2003 press release disclosed the full extent of the
     errors in the 2003 projections and announced an impairment charge
     in the fourth quarter of 2003 against intangible assets at Catalina
     U.K.

3.    Press releases from June 30, 2003, to August 25, 2003, disclosing
     revenue recognition problems at CHR and delays in the filing of the
     company's 10-K for fiscal year 2003.

<u>See</u> <u>id.</u> at 4.

Relying upon <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 125 S. Ct. 1627 (2005),[9] Defendants argue that the lead Plaintiffs, the Alaska Fund and Virginia Anderson lack standing because they cannot demonstrate loss causation regarding the UK Impairment and Revenue Recognition Claims as they sold all of their Catalina holdings before any corrective disclosure about these two claims was revealed to the market. Defendants point out that the Alaska Fund purchased 4,000 shares of Catalina stock between January 12, 2001, and March 27, 2002, and sold all of its holdings on October 2-3, 2002. <u>See</u> (Doc. 92-3 at 3). Virginia Anderson purchased her Catalina stock on May 30, 2002, and sold all of her shares on December 30, 2002. <u>See</u> (Doc. 92-4).[10] While acknowledging that Plaintiffs may assert a "common course of conduct" theory to justify their claim to represent those harmed by misrepresentations which pre-date or post-date their stock purchases, they contend that the theory has application here only in relation to the 2003 Projection claims. Defendants urge the court must accordingly

---

[9]In <u>Dura</u>, the Supreme Court reversed the Ninth Circuit's decision finding that a plaintiff can satisfy the loss causation requirement simply by alleging that a security's price at the time of purchase was inflated because of misrepresentation. <u>Dura</u>, 125 S. Ct. at 1634-35. The Court held that under the Private Securities Litigation Reform Act of 1995, 109 Stat. 737, a securities plaintiff bears the burden of proving that the defendant's misrepresentations (or other fraudulent conduct) proximately caused the plaintiff's economic loss. <u>Id.</u> at 1633 (quoting 15 U.S.C. §§ 78u-4(b)(4)). Defendants assert that <u>Dura</u> merely reinforces existing law in this circuit, citing <u>Robbins v. Koger Props., Inc.</u>, 116 F.3d 1441 (11th Cir. 1997).

[10]As legal support for this contention, Defendants cite <u>In re Cable & Wireless, PLC, Sec. Litig.</u>, 217 F.R.D. 372, 379 (E.D. Va. 2003); <u>Salsitz v. Peltz,</u> 210 F.R.D. 95, 99 (S.D.N.Y. 2002); <u>In re Initial Public Offering Sec. Litig.</u>, 227 F.R.D. 65, 120-21 (S.D.N.Y. 2004); <u>Piazza v. EBSCO Indus., Inc.</u>, 273 F.3d 1341 (11th Cir. 2001); <u>Sandlin v. Shapiro & Fishman</u>, No. 95-213-CIV-FTM-17D, 1997 WL 155418, at *5 (M.D. Fla. Mar. 18, 1997); <u>In re HealthSouth Corp. Sec. Litig.</u>, 213 F.R.D. 447, 460-61 (N.D. Ala. 2003); <u>Gabrielsen v. BancTexas Group, Inc.</u>, 675 F. Supp. 367, 371 (N.D. Tex. 1987). <u>See</u> (Doc. 92 at 10-11).

deny class certification for the class encompassing the UK Impairment and Revenue Recognition Claims.[11]

As for the 2002 Projection claims, Defendants urge that lead Plaintiffs are atypical of the class members who were allegedly damaged by the 2002 Projections because they bought their stock after the market had absorbed public information revealing that the company would not attain its forecast 2002 Projections.[12]  As a consequence, Defendants urge that Lead Plaintiffs are subject to a unique "truth on the market" defense that disqualifies them as typical representatives of the proposed class and class certification is appropriately denied.[13]

By Defendants' argument, the Alaska Fund and Virginia Anderson have standing to represent adequately only a subclass of investors damaged by the 2003 Projections, that is, those who purchased Catalina stock during the nine-month period from January 17, 2002, when the company made its first projections for FY2003, to October 1, 2002, when it revised

---

[11]Defendants cite to Sandlin, 1997 WL 155418, at *6; In re HealthSouth Corp., 213 F.R.D. 460-61; In re Initial Public Offering, 227 F.R.D. at 121; Gabrielsen, 675 F. Supp. at 371.

[12]Here, Defendants cite the company press releases dated June 20, 2001, and October 18, 2001, which revised growth estimates downward.

[13]In support of this argument, Defendants cite Hanon v. Dataproducts Corp., 976 F.2d 497, 508-09 (9th Cir.1992); Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990); In re Healthsouth Corp., 213 F.R.D. at 459; Rolex Employees Retirement Trust v. Mentor Graphics Corp., 136 F.R.D. 658, 663 (D. Or. 1991).

those projections downward.  As such, Defendants urge the court to deny Plaintiffs' motion

for class certification altogether or to limit class certification as to the 2003 Projections claim.[14]

Plaintiffs argue that Defendants have distorted their claims by parsing the Complaint

into four separate claims and arguing that Lead Plaintiffs lack standing to bring three of those

claims.[15]  Instead, Plaintiffs reiterate that they have the experience and expertise to act as lead

Plaintiffs and are proper parties to raise the *two* claims alleged, violations of § 10(b) and §

20(a) of the Securities Exchange Act, in a representative capacity precisely because they are

typical of those investors who purchased Catalina stock during the Class Period and sold at a

loss during the Class Period after Catalina disclosed adverse information concerning its

revenue and earnings estimates.  As Lead Plaintiffs view the claims, they derive from and are

based on a common course of conduct by the Defendants involving accounting improprieties

and public misrepresentations and omissions that were calculated to and did defraud the

investing public by inflating Catalina's stock artificially during the Class Period.  Lead Plaintiffs

and all other class members were damaged by this scheme when they sold their stock as the

truth about Catalina's financial condition was revealed and Catalina stock prices plummeted.

Because they suffered the same loss as did other class members and their claims are typical of

the class, Plaintiffs maintain that their motion for class certification may not be defeated

---

[14]Alternatively, Defendants argue that Plaintiffs must propose adequate class
representatives for the other three claims.

[15]On this point, Plaintiffs argue the Defendants here have rehashed the arguments raised
in their motion to dismiss and rejected by the court.  See (Doc. 75).

because of the timing of their particular purchases or the substantive issues of loss causation and the truth on the market defense.

Defendants are correct that each class representative must have standing to assert each class claim.  See Prado-Steinman, 221 F.3d at 1279.  However, contrary to Defendants' arguments, I conclude that Lead Plaintiffs have established their standing to do so here.  By Plaintiffs' allegations, both the Alaska Fund and Ms. Anderson suffered damages from a common course of improper accounting practices and public misrepresentations or omissions beginning in or about October 1999, and continuing until finally revealed in or about August 2003.  Lead Plaintiffs alleged but two violations during this period, a § 10(b) and a § 20(a) violation, and the damages they sustained are the same type as those sustained by other members of the putative class.  That the Lead Plaintiffs might be characterized as in-and-out traders does not prevent their acting on behalf of the class.  Persuasive authority indicates that an in-and-out trader, one who both buys and sells his stock within the class period, can have standing as a class representative.  See Barr v. Matria Healthcare, Inc., 324 F. Supp. 2d 1369 (N.D. Ga. 2004) (citing Wool v. Tandem Computers Inc., 818 F.2d 1433 (9th Cir.1987); Hoffman v. Szyszko, No. 94-C 2357, 1994 WL 721569 (N.D. Ill. Dec. 27, 1994); In re Scott Paper Co. Sec. Litig., 142 F.R.D. 611 (E.D. Pa. 1992); Shields v. Smith, No. C-90-0349 FMS, 1992 WL 295179 (N.D. Cal. Aug. 14, 1992)); see also Piazza v. Ebsco Indust., Inc., 273 F.3d 1341 (11th Cir. 2001) (employee had standing to assert claims of class from 1983 to present, even though he was an employee and plan participant only from 1988 to 1996).  Because the Complaint sets forth a common and related course of conduct beginning in October 1999 and

culminating in August 2003, the court finds that the lead Plaintiffs possess the requisite standing to represent the proposed class.[16]  While the matter of loss causation may become pertinent to the merits of Plaintiffs' claims and the timing of purchases may impact on damages and the asserted defenses must be addressed in due course, the court is not now in a position to, nor must it determine, whether Plaintiffs can meet their burden of proof on these substantive issues before deciding the class certification issue.  For class certification purposes, Plaintiffs' allegations, as supported in the record, are sufficient to confer standing.

B.

With respect to the numerosity requirement of Rule 23, Plaintiffs assert that there are 52 million shares of Catalina stock outstanding.  The class is likely to include hundreds or thousand of individuals and entities throughout the United States who acquired Catalina common stock during the Class Period.  Defendants do not dispute that this first requirement is met.

---

[16]Several other district courts have reached this conclusion in similar circumstances. See Crowell v. Ionics, Inc., 343 F. Supp. 2d 1, 13-14 (D. Mass. 2004) (citing Upton v. McKerrow, 887 F. Supp. 1573, 1577 (N.D. Ga. 1995); Priest v. Zayre Corp., 118 F.R.D. 552, 557 (D. Mass. 1988) (holding that differing purchase dates does not bar class certification, if all purchases occurred during the course of a common, fraudulent scheme); Kirby v. Cullinet Software, Inc., 116 F.R.D. 303, 311-12 (D. Mass. 1987); Nicholas v. Poughkeepsie Sav. Bank/FSB, No. 90 CIV. 1607 (RWS), 1990 WL 145154, at *6 (S.D.N.Y. Sept. 27, 1990)); In re Rhythms Sec. Litig., 300 F. Supp. 2d 1081, 1085 (D. Colo. 2004) (citing In re Intelcom Group, Inc. Sec. Litig., 169 F.R.D. 142, 151 (D. Colo. 1996); Kinney v. Metro Global Media, Inc., 170 F. Supp. 2d 173, 181 (D.R.I. 2001) (citing In re One Bancorp Sec. Litig., 136 F.R.D. 526, 531 (D. Me. 1991); Priest v. Zayre Corp., 118 F.R.D. 552, 557 (D. Mass. 1988); Kirby v. Cullinet Software, Inc., 116 F.R.D. 303, 311-12 (D. Mass. 1987)).

C.

Plaintiffs next argue that the proposed class members share common questions of law and fact that affect all or a significant number of the class members.  Plaintiffs primarily argue that proving the existence and nature of Defendants' misleading statements and material omissions are the most important issues in a securities case such as this, and these issues will be common to all members of the class in this action.  Additionally, Plaintiffs argue that their claims raise other, related questions of law and fact that are common to all class members, including whether Defendants violated federal securities laws; whether Defendants participated in a fraudulent scheme; whether Defendants' publicly disseminated statements omitted and/or misrepresented material facts; whether Defendants acted willfully, knowingly, or recklessly in omitting and/or misrepresenting material facts; whether Catalina stock prices were artificially inflated due to the Defendants' alleged material omissions and/or misrepresentations; and whether class members sustained damages and the appropriate measure of damages.

Defendants make only a passing argument that Plaintiffs lack any evidence to demonstrate that common issues of law and fact regarding loss causation predominate over individual ones.  See (Doc. 92 at 12, n.7).  Specifically, Defendants cite to Plaintiffs' responses to interrogatories suggesting that they were uncertain how they would prove economic loss on a class-wide basis.  Id. (citing Ex. G at 7-11) ("The issue of Plaintiffs' economic loss and/or damages is complex and requires expert testimony.  Plaintiffs have not yet determined what expert testimony they intend to offer.").

37

At this stage of the proceedings, Plaintiffs have sufficiently demonstrated specific issues related to the whether Defendants engaged in a scheme to defraud by employing accounting tricks or improprieties, misleading public statements, and material omissions in violation of securities laws that are common to the class and predominate over individual issues. Thus, Plaintiffs have satisfied the commonality requirement for class certification.

D.

As discussed above, Defendants argue that because Lead Plaintiffs lack standing as to two of the claims and a unique defense can be asserted as against a third claim, their claims are not typical of the proposed class, and they are not adequate to represent the proposed class. For the reasons set forth above in the discussion related to standing, the court finds the claims arise from a common course of conduct by the Defendants, and the injuries to the Lead Plaintiffs are typical of those inflicted on the other members of the proposed class. There are but two alleged violations, a § 10(b) and a § 20 (a) violation. While the named Plaintiffs may have purchased and traded stocks at different times within the Class Period, if the allegations are correct, they sustained damages of the same type as those suffered by other members of the putative class. At this stage, Defendants have not demonstrated that the claims of the named Plaintiffs are subject to any unique defenses or that their claims are otherwise atypical of the claims asserted by the class as a whole.

Accordingly, Plaintiffs have satisfied the typicality requirement.

38

E.

Regarding the fourth requirement for class certification, adequacy of class representatives and counsel, Lead Plaintiffs demonstrate a sufficient degree of sophistication and experience as well as interest to make them suitable to the task.  Further, they argue that their interests are coextensive with and not antagonistic to the interests of the class as a whole, since they were all injured by the same wrongful acts of Defendants.  With respect to the adequacy of counsel, Plaintiffs indicate that counsel has extensive experience in the prosecution and resolution of complex securities fraud class actions in this district and throughout the United States.

Defendants chiefly question the appropriateness of the Alaska Fund as a Lead Plaintiff due to its "close and on-going relationship with class counsel."  See (Doc. 92 at 18 n.10). They suggest that the Fund and counsel may have interests in the litigation and goals which are different from those of the class.  However, they do not dispute the competence of counsel to pursue the litigation.  At present and for the reasons discussed above, the court finds that these Plaintiffs' claims and interests in the litigation are not antagonistic to the interests of the class, and they are adequate representatives of the class.  See Freeland v. Iridium World Communications, Ltd., No. CIV.A. 99-1002, 2006 WL 56536, at *7 (D.D.C. Jan. 9. 2006) (finding that class representative's status as an "in and out" purchaser does not render him an inadequate representative of the class that includes members who did not sell until after the class period ended).  Until demonstrated otherwise, there is no reason to question the

39

adequacy of counsel either, and therefore the fourth requirement under Rule 23(a) is likewise met.

F.

In addition to the prerequisites of Rule 23(a), Plaintiffs must also satisfy the requirements of Rule 23(b) that common questions of law or fact predominate over individual questions and that class resolution is  superior to other methods of adjudication.  Fed. R. Civ. P. 23(b)(3); Amchem, 521 U.S. at 615, 623-24.  With respect to the predominance requirement, "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof."  Rutstein, 211 F.3d at 1233 (quoting Kerr v. City of West Palm Beach, 875 F.2d 1546, 1548 (11th Cir. 1989)).  "Predominance is a test readily met in certain cases alleging . . . securities fraud."  AmChem Prods., 521 U.S. at 625; In re Ins. Mgmt. Solutions Group, Inc., 206 F.R.D. 514, 518 (M.D. Fla. 2002).  The mere presence of individual factual issues will not render plaintiffs' misrepresentation claims, which involve an overwhelming number of common and factual legal issues, unsuitable for class treatment.  Klay v. Humana, Inc., 382 F.3d 1241, 1258 (11th Cir. 2004).

As to the superiority of a class action to other methods of adjudication, the court must consider the factors set forth in Rule 23(b)(3):  (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in

40

the particular forum; (D) the difficulties likely to be encountered in the management of a class action.  Fed. R. Civ. P. 23(b)(3).  Separate securities fraud actions by each of the class members in a case such as this would be repetitive, wasteful, and an extraordinary burden on the courts.  Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 725 (11th Cir. 1987) (quoting Kennedy v. Tallant, 710 F.2d 711, 718 (11th Cir. 1983)).

Upon consideration, these factors weigh in favor of a conclusion that a class action is superior method of adjudicating these claims of security fraud.  Plaintiffs have established that class issues concerning liability for securities violations predominate over individual issues, including economic loss.  Although Defendants argue otherwise on that point, it would appear that if the matter of damages is reached in this litigation, it will be determined on the basis of a manageable formula(s).  In all other applicable respects, the class action appears the most efficient and superior means of resolving a multitude of similar or related claims.  Accordingly, the requirements of Rule 23(b) are likewise met, and class certification is appropriate in this action.

## V.

For the foregoing reasons, it is recommended that the court GRANT Plaintiffs' Motion for Class Certification and Incorporated Memorandum of Law (Doc. 81); appoint Lead Plaintiffs Virginia Anderson and the Alaska Electrical Pension Fund as class representatives; and certify this action as a class action on behalf of the class of all persons who purchased the common stock of Defendant Catalina Marketing Corporation between October

41

14, 1999, and August 25, 2003, and were damaged thereby, exclusive of Defendant Catalina

Marketing Corporation, Defendant Daniel Granger, and Defendant Christopher Wolf, members

of each Individual Defendant's family, any entity in which any Defendant has a controlling

interest, and the legal affiliates, representatives, heirs, controlling persons, successors, and

predecessors in interest or assigns of any such excluded party.

Respectfully submitted on this
29th day of January 2006.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations

contained in this report within ten days from the date of its service shall bar an aggrieved party

from attacking the factual findings on appeal and a *de novo* determination by a district judge.

28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; M.D. Fla. R. 6.02; see also Fed. R. Civ. P. 6; M.D.

Fla. R. 4.20.

Copies to:
The Honorable James D. Whittemore, United States District Judge
Counsel of Record